# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**AARON EDWARDS,**

      **Plaintiff,**

**v.**                                       **Civil Action No. 2:14cv17**
                                                     **(Judge Bailey)**

**JIM RUBENSTEIN, Commissioner;**
**MARVIN C. PLUMLEY, Warden;**
**ROBIN MILLER; NANCY STEVENS,**
**Chaplain; and RANDY SHREVE,**
**Unit Manager,**

      **Defendants.**

## REPORT AND RECOMMENDATION

### I.  Procedural History

On March 3, 2014, the *pro se* plaintiff, a prisoner incarcerated at the Huttonsville Correctional Center ("HCC") in Huttonsville, West Virginia, initiated this case by filing a filing a civil rights complaint against the above-named defendants pursuant to 42 U.S.C. §1983. The plaintiff was granted permission to proceed as a pauper on March 4, 2014 and paid his initial partial filing fee on March 20, 2014.  On January 20, 2015, after a preliminary review, the defendants were directed to answer the complaint in light of the United States Supreme Court's recent opinion in Holt v. Hobbs.[1]  On February 11, 2015, the defendants filed an answer to the complaint.[2] By Order entered February 17, 2015, the defendants were directed to file a supplemental response in light of Holt v. Hobbs.

On February 26, 2015, the plaintiff filed a Motion to Compel the Defendants' [sic] to Certify their Filings, seeking a copy of defendants' Answer, contending he was unaware it had

---

[1] Holt v. Hobbs, 190 L. Ed. 2d 747 (2015).

[2] Despite the Court's clear direction in its Order to Answer, defendants' answer made no mention of Holt v. Hobbs.

been filed until he received a copy of the Order directing the defendants to file their supplemental response, and seeking to have further mailings from defendants sent via certified mail. By Order entered March 2, 2015, plaintiff's motion was granted. Defendants were directed to send another copy of their initial pleading to the plaintiff and plaintiff was sent a copy of the Defendant's Supplemental Response,[3] filed that day. Despite being directed to file any response that he might have to the defendants' motion to dismiss contained within their Supplemental Response within twenty-one days, the plaintiff did not file a response.

By Order and <u>Roseboro</u> Notice entered December 16, 2015, Defendants' Supplemental Response was construed as a Motion for Summary Judgment and plaintiff was directed to file any opposition he might have to it by January 6, 2016; the Order/Roseboro Notice was sent to plaintiff via certified mail, return receipt requested. A review of the docket reveals that delivery of the same was accepted at HCC on December 17, 2015.[4] As of the date of this Report and Recommendation, plaintiff has not filed a response.

## II. <u>Contentions of the Parties</u>

### A. <u>The Complaint</u>

In his complaint, the plaintiff, a Muslim, raises First Amendment, Religious Land Use and Institutionalized Persons Act ("RLUIPA"), and an Equal Protection claims against the named defendants, all administrative staff or employees of the West Virginia Division of Corrections ("WVDOC"). Plaintiff alleges that his right to freely practice his religion has been impermissibly restricted at HCC because he has been denied the right to grow a beard and forced to shave, in violation of the tenets of his religion. Further, he contends that at HCC, Muslim

---

[3] Attached to the Defendants' Supplemental Response as Exhibit 1 was a copy of WVDOC Policy Directive 334.01, Inmate Grooming Standards, newly approved and signed by defendant James Rubenstein, WVDOC Commissioner, on March 1, 2015. <u>See</u> Dkt.# 28-1.

[4] Dkt.# 42.

inmates are not accorded the same rights as are inmates of other faiths. Plaintiff contends that HCC's policy toward Muslim inmates is a substantial burden on the free exercise of Muslim inmates' religion, and the difference in the way in which Muslims and Christians are treated demonstrates that HCC "has exaggerated its response to its alleged security concern that if Muslims are given alleged *"leadership roles"* the same will *"disrupt the orderly operation for the facility, positing a potential threat to inmates and staff and the public*."[5]

As to specific defendants, Plaintiff alleges that Defendant Rubenstein ("Rubenstein"), as Commissioner of the WVDOC, is in charge of approving policies made by the HCC; and knew that plaintiff's Muslim religious tenets required the growing of a beard but upheld the prison policy forcing him to shave anyway, by repeatedly denying plaintiff's grievances over the issue.[6]

Plaintiff avers that Defendant Robin Miller ("Miller") "has the responsibility to manage the prison's religious services;"[7] assisted defendant Stevens in drafting the policy requiring Muslim inmates to shave while knowing that it violated plaintiff's and other Muslim inmates' religious rights;[8] and that Miller and Stevens treat Muslim inmates differently than Christian inmates, because they require Muslim inmates to watch videotaped Muslim services performed by an Imam[9] at the MOCC instead of conducting their own services, while they frequently

---

[5] Dkt.# 1-1 at 10. (emphasis in the original). See also November 18, 2013 Memo to Aaron Edwards from Nancy Stevens, Corrections Program Specialist, Sr. Chaplain, Dkt.# 1-3 at 7.

[6] Dkt.# 1 at 2 and 7; Dkt.# 1-1, ¶18 at 4 and ¶29 at 6.

[7] Dkt.# 1 at 3.

[8] Dkt.# 1 at 3 and 8.

[9] An Imam is (1) the prayer leader of a mosque; (2) a Muslim leader of the line of Ali held by Shiites to be the divinely appointed, sinless, infallible successors of Muhammad; and/or (3) any of various rulers that claim descent from Muhammad and exercise spiritual and temporal leadership over a Muslim region. See < http://www.merriam-webster.com/dictionary/imam >

permit "Christian[] [inmates] to give prayer testimonies, conduct prayer services, and freely discuss their religion without interference" while forbidding Muslim inmates to do the same.[10]

Plaintiff alleges that Defendant Marvin C. Plumley ("Plumley"), as the Warden at HCC, is the "ultimate policy maker" for HCC;[11] Plumley approved the policy requiring HCC inmates to be clean-shaven; and despite being advised by plaintiff's administrative remedies that as a Muslim, his religious beliefs required the growing of a beard, Plumley repeatedly denied his grievances.[12] Further, the plaintiff alleges it was on Plumley's authority that Defendant Nancy Stevens required Muslim inmates to watch the video of MOCC's Imam conducting services, instead of permitting them to conduct their own.

Plaintiff avers that Defendant Nancy Stevens ("Stevens") is HCC's chaplain; that despite his having advised her that he was a Muslim and that his religious tenets forbade him to shave, she drafted a policy requiring Muslim inmates to shave and refused him any religious accommodation on the issue. Plaintiff further alleges that while HCC "consistently allowed Christian services to be conducted with and most often without the presents [sic] of a Chaplain[,]"[13] a WVDOC chaplain, usually defendant Stevens,[14] physically sits in on and supervises the HCC Muslim inmates' services to ensure that no Muslim inmate leads discussions about their faith; attempts to conduct a prayer services; or commits any other act that could be construed as assuming a "leadership role."[15] He further contends that Stevens requires that HCC

---

[10] Dkt.# 1-1, ¶¶21 and 22 at 4 – 5.

[11] Dkt.# 1 at 2.

[12] Dkt.# 1 at 2 and 8; Dkt.# 1-1, ¶16 at 4, and ¶26 at 5.

[13] Dkt.# 1-1 at 10.

[14] Dkt.# 1-1 at 10.

[15] Dkt.# 1-1, ¶21 at 5.

Muslim inmates watch a videotaped Imam, instead of practicing their religion in the way they have been accustomed to practice it.[16]

Plaintiff alleges that Defendant Randy Shreve ("Shreve") is an HCC Unit Manager and is "in charge of investigating inmate grievances;"[17] that despite his having advised Shreve that his rights were being violated when defendant Stevens drafted the policy requiring Muslim inmates to shave, Shreve "did nothing to correct the issue" and failed to "make the prison aware that my constitutional rights were being violated."[18]

Plaintiff alleges that HCC's restrictions on his religious rights have caused him to become "mentally and spiritually depressed."[19]

The plaintiff maintains that he has exhausted his administrative remedies with regard to his claims.

As relief, the plaintiff seeks only injunctive relief, requesting that HCC be made to "respect my religious right and practice by allowing me to grow a beard at least ¼ of a [sic] inch in accordance with my Islamic religion and to re-write policy directive regarding making Muslim inmates shave."[20]

**B. The Defendants' Answer**

---

[16] Dkt.# 1-1 at 9.

[17] Dkt.# 1 at 3 – 4.

[18] Dkt.# 1 at 9.

[19] Dkt.# 1 at 9.

[20] Dkt.# 1 at 9 and Dkt.# 1-1 at 1.

Defendants' February 11, 2015 answer admits that plaintiff has exhausted his administrative remedies with regard to his claims.[21] Defendants admit that Defendant Plumley promulgated an Operational Procedure for HCC on inmate grooming but contend that the HCC Inmate Grooming Standards Policy Directive forbidding facial hair is not contrary to the United States Constitution, RLUIPA, or other federal law, and is reasonably related to a legitimate penological interest. Further, they contend that their compelling interest in the safe/secure functioning of HCC and providing for general public safety mandates the denial of a ¼" or greater beard, and is the least restrictive alternative, "in light of plaintiff's overall record and circumstances at . . . [HCC]."[22] Thus, they argue, injunctive relief must be denied. Further, they contend that injunctive relief must denied or limited pursuant to 18 U.S.C. §3626. Defendants admit that while plaintiff was at MOCC, he was issued a "shaving pass," but when he arrived at HCC, he was not, and was required to shave.

Regarding plaintiff's claims that the WVDOC policy does not permit Muslim inmates to conduct, lead, or facilitate religious programs, the defendants admit that that is HCC policy. Defendants assert that because there is no Imam available to lead Muslim worship services at HCC, alternative methods, including video from MOCC have been used. Defendants further admit that either defendant Nancy Stevens ("Stevens"), the HCC chaplain, or other HCC staff "may monitor religious services of Muslim inmates and enforce Policy and Procedure."

Defendants assert that plaintiff's complaint fails to allege sufficient facts to state a claim upon which relief can be granted. They contend that "to the extent Plaintiff seeks damages" against them in their official capacities, such claim is "invalid" because individuals sued in their official capacities are not "persons" under 42 U.S.C. §1983, and recovery of damages against

---

[21] Dkt.# 24, ¶23 at 4.

[22] Defendants do not elaborate on what they mean by this statement. Dkt.# 24 at 5.

state officials acting in their official capacity is not permitted. Further, defendants aver that they are entitled to absolute and qualified immunity and that that *respondeat superior* does not apply. They contend that to the extent plaintiff seeks punitive damages, such a claim violates their right to procedural and substantive due process under the Fifth and 14th Amendment of the United States Constitution and the West Virginia Constitution and creates an unnecessary and undue risk of an improper verdict on the issue of liability, the measure of damages, and the issue and measure of punitive damages. Finally, they argue that such claims violate their right to protection against "excessive fines" under the Eighth Amendment of the U.S. Constitution and Article II, §V of the W.V. Constitution.

## C. Defendants' Supplemental Response/Motion for Summary Judgment

The defendants report that in light of Holt v. Hobbs, effective March 1, 2015, the WVDOC has changed its grooming policy: inmates are now no longer prohibited from growing facial hair up to one-half inch long. They attach a copy of the new HCC grooming policy. They argue that because plaintiff has received his requested relief, this case should now be dismissed as moot, contending that "[a]ny additional prospective relief would amount to an advisory opinion regarding facts [sic] scenarios not presented to this Court by this Plaintiff."[23]

## III. Standard of Review

### A. Motion to Dismiss

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded

---

[23] Dkt.# 28 at 2.

allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. Mylan Labs, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993); see also Martin, 980 F.2d at 952.

The Federal Rules of Civil Procedure "require only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). Courts long have cited the "rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [a] claim which would entitle him to relief." Conley, 355 U.S. at 45-46. In Twombly, the United States Supreme Court noted that a complaint need not assert "detailed factual allegations," but must contain more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Conley, 550 U.S. at 555 (citations omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," (Id.). (citations omitted), to one that is "plausible on its face," (Id.). at 570, rather than merely "conceivable." (Id.). Therefore, in order for a complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." Bass v. E.I. DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir. 2003) (citing Dickson v. Microsoft Corp., 309 F.3d 193, 213 (4th Cir. 2002); Iodice v. United States, 289 F.3d 279, 281 (4th Cir. 2002)). In so doing, the complaint must meet a "plausibility" standard, instituted by the Supreme Court in Ashcroft v. Iqbal, where it held that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009). Thus, a well-pleaded complaint must offer more than "a

sheer possibility that a defendant has acted unlawfully" in order to meet the plausibility standard and survive dismissal for failure to state a claim. (Id).

When a motion to dismiss pursuant to Rule 12(b)(6) is accompanied by affidavits, exhibits and other documents to be considered by the Court, the motion will be construed as a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

## B.   Motion for Summary Judgment

Under the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).  In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party."  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).    The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In Celotex, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact.  Celotex at 323.  Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts."  Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The nonmoving party must present specific facts showing the existence of a genuine issue for trial. Id.  This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but  . . .  must set forth specific

facts showing that there is a genuine issue for trial." <u>Anderson</u> at 256. The "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent the entry of summary judgment. <u>Id.</u> at 248. Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." <u>Matsushita</u>, at 587 (citation omitted).

**IV. <u>Analysis</u>**

**A. <u>42 U.S.C. §1983</u>**

42 U.S.C. §1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage.....subjects, or causes to be subjected, any citizen of the United States...to the deprivation of any rights...secured by the Constitution and laws, shall be liable to the party injured in any action at law...or suit in equity. Therefore, the initial inquiry in a §1983 case is as follows: (1) was the conduct complained of committed by a person acting under the color of state law and (2) did that conduct deprive the complainant of rights, privileges, or immunities secured by the Constitution or laws of the United States.

<u>See</u> <u>Hale v. Tallapoosa County</u>, 50 F.3d 1579 (11th Cir. 1995); <u>Harvey v. Harvey</u>, 949 F.2d 1127, 1130 (11th Cir. 1992).

Whether a constitutional right is alleged to have been violated is usually clear, but the under color of law requirement has been subject to more debate. "As a general rule, 'a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law.'" <u>Conner v. Donnelly</u>, 42 F.3d 220, 223 (4th Cir. 1994) (*quoting* <u>West v. Atkins</u>, 487 U.S. 42, 50 (1988)); <u>see</u> <u>also</u> <u>Lugar v. Edmonson Oil Co., Inc.</u>, 457 U.S. 922, 936 n.18 (1982) (finding that "state employment is generally sufficient to render the defendant a state actor"). Accordingly, any person acting with a badge of authority given to them by virtue of their position with the state who violates a person's constitutional rights is subject to

liability for the unconstitutional act. See West, 487 U.S. at 49 *(citing* United States v. Classic, 313 U.S. 299, 326 (1941)); see also Monroe v. Pape, 365 U.S. 167, 187 (1961).

## C. Eleventh Amendment Immunity

Defendants contend that the Complaint should be dismissed because to the extent that Plaintiff seeks damages, defendants are entitled to absolute immunity under the Eleventh Amendment to the United States Constitution.[24]

It is true that suit instituted under §1983 against state officials in their official capacity is barred by the Eleventh Amendment when it seeks money from the state treasury in the form of damages. See Will v. Michigan Dep't of St. Police, 491 U.S. 58 (1989). However, Will also makes clear that "[o]f course a state official in his or her official capacity, when sued for injunctive relief, would be a person under §1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" Id. at 71 n. 10 (*citing* Kentucky v. Graham, 473 U.S., at 167, n. 14); *Ex Parte* Young, 209 U.S. 123, 159-160 (1908). Moreover, suits for damages against state officials sued in their individual capacity are not barred. See Hafer v. Melo, 502 U.S. 21 (1991); Goodman v. Rockefeller, 947 F.2d 1186, 1187 (4th Cir. 1991).

Defendants' argument that plaintiff's complaint should be dismissed because defendants are entitled to immunity under the Eleventh Amendment is based on an incorrect and incomplete reading of §1983 case law. As discussed above, the Eleventh Amendment only bars a §1983 suit based on monetary damages against state officials when sued in their official capacity. Here, however, despite the fact that plaintiff does not specify whether he is suing the defendants in their individual or official capacities, plaintiff is only seeking injunctive relief and makes no

---

[24] Dkt.# 24 at 6.

claim for monetary damages. Accordingly, because the Eleventh Amendment does not bar Plaintiff's §1983 claims for prospective injunctive relief, defendants' motion to dismiss this matter as moot contained within their Supplemental Response,[25] construed as a motion for summary judgment, should be denied on this ground.

**D. <u>Plaintiff's §1983 Claims Against State Officials in their Official or Individual Capacities</u>**

Defendants make a blanket assertion that the complaint should be dismissed because, as state officials, they cannot be sued in their official capacity under 42 U.S.C. §1983.[26]  As discussed above, Defendants incorrectly applied the law as related to bringing §1983 claims against state officials because there is no bar to Plaintiff's claims against state officials in their official capacities for prospective injunctive relief.

Here, as noted *supra*, nowehere in plaintiff's complaint or its attached memorandum in support does he explain whether defendants are being sued in their official capacity or individual capacity. To the contrary, on the form complaint it asks plaintiff to name the defendants. Then it asks plaintiff to list each defendant's position, place of employment, and address. Plaintiff did so. The Clerk of the Court then opens the case according to the information provided.  Complaints filed by a *pro se* plaintiff are held to a less stringent standard than those developed by a lawyer, <u>Gordon v. Leeke</u>, 574 F.2d 1147, 1151 (4th Cir. 1971), especially when the complaint alleges violations of a plaintiff's civil rights. <u>See</u> <u>Haines v. Kerner</u>, 404 U.S. 519, 521 (1972); <u>Loe v. Armistead</u>, 582 F.2d 1291, 1295 (4th Cir. 1978); <u>Laboke v. City of Fairmont</u>, 208 F.3d 209, *1 (4th Cir. 2000) (unpublished) (finding that *pro se* plaintiffs are entitled to the court's most liberal reading of the allegations," and "[w]hen a complaint is broad in nature, the court should use

_____

[25] Dkt.# 28 at 3.

[26] Defendant's Answer, Dkt.# 24 at 6, (*citing* <u>Will v. Michigan Dep't. of State Police</u>, 491 U.S. 58 (1989).

pretrial conference, discovery, and/or summary judgment to define the issues, not dismissal for failure to state a claim").

Here, because plaintiff has not asserted whether he is suing the defendants in their official or individual capacities and the only stated grounds for relief are injunctive relief, given the liberal standards set forth, and in the spirit of allowing a *pro se* plaintiff to develop meritorious claims, the Court will construe the Complaint as suing the officers and administrator in both their individual and official capacities. Defendants can be sued in their official capacities for injunctive relief or in their individual capacities for monetary damages. See Will, 491 U.S. at 71.

Therefore, Defendants cannot be dismissed from this action on this ground.

**E. Defendants Claim to Absolute Immunity under Article VI, Section 35 of the Constitution of West Virginia.**

The Court can summarily dispose of Defendants' argument as to why this complaint should be dismissed because it is based on state law grounds. Defendants contend that plaintiff's case must be dismissed because to the extent that he seeks damages, pursuant to Article VI, Section 35 of the West Virginia Constitution, the defendants are absolutely immune, because suits against agents of the State of West Virginia are prohibited.[27]

However, succinctly put, "[a] state legislature has no authority to determine whether or how an action may proceed under federal law." Cunningham v. West Virginia, 6:06-cv-169, 2007 WL 895866, at *5 (S.D. W.Va. Mar. 22, 2007); see also Patsy v. Bd. of Reg. of State of Fl., 457 U.S. 496, 516 (1983); Steffel v. Thompson, 415 U.S. 452, 472-73 (1974) (stating that "[w]hen federal claims are premised on [§ 1983] – as they are here – we have not required exhaustion of state judicial or administrative remedies, recognizing the paramount role Congress

---

[27] Defendants' Answer, Dkt.# 24 at 6.

has assigned to the federal courts to protect constitutional rights.") Accordingly, this ground is unfounded and fails to serve as a valid ground justifying dismissal of Plaintiff's suit.

**F. <u>First Amendment: Free Exercise of Religion Clause Violation</u>**

Prisoners retain their constitutional rights to freedom of religion pursuant to the First Amendment. <u>See</u> <u>Turner v. Safley</u>, 482 U.S. 78, 84 (1987) (stating that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution."). As such, prisoners must be given "reasonable" opportunities to practice their religion. <u>Cruz v. Beto</u>, 405 U.S. 319, 322 (1972). However, the Supreme Court has further cautioned that "courts are ill equipped to deal with the increasingly urgent problems of prison administration." <u>Lovelace v. Lee</u>, 472 F.3d 174, 199 (4th Cir. 2006) (*citing* <u>Procunier v. Martinez</u>, 416 U.S. 396, 405 (1974)). Thus, "courts must accord deference to the officials who run a prison, overseeing and coordinating its many aspects, including security, discipline, and general administration." <u>Id</u>. (*citing* <u>O'Lone v. Estate of Shabazz</u>, 482 U.S. 342, 349-50 (1987); <u>Turner</u>, 482 U.S. at 84-85).

In order to achieve this deference, in part, the Supreme Court revisited the level of scrutiny applied to constitutional claims raised by people currently incarcerated. Thus, the Supreme Court held that when an incarcerated person alleges a prison regulation or policy violates their constitutional rights, the "regulation is valid if it is reasonably related to legitimate penological interests." <u>Turner</u>, 482 U.S. at 89 (defining the appropriate standard as requiring rational basis, not strict scrutiny analysis). In lowering the standard of review, the Court reasoned that "[s]ubjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration." <u>Id</u>.

The <u>Turner</u> court laid out four factors for the court to consider when "determining the reasonableness of the regulation at issue." <u>Id</u>. The test asks:

> (1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right . . . remain open to prison inmates," an inquiry that asks broadly whether inmates were deprived of all forms of religious exercise or whether they were able to participate in other observances of their faith; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action, which may suggest that it is "not reasonable, but is [instead] an exaggerated response to prison concerns.

<u>Lovelace</u>, 472 F.3d at 200 (*citing* <u>Turner</u>, 482 U.S. at 89–92 (internal quotation marks and citations omitted)). Therefore, when determining the reasonableness of a prison regulation, the court must apply this four factor <u>Turner</u> test.

## G.  <u>RLUIPA, 42 U.S.C. §§ 2000cc *et seq*.</u>

Plaintiff also alleges a statutory claim under the RLUIPA.

Congress enacted RLUIPA in 2000 "because it found that some prisons have restricted religious liberty 'in egregious and unnecessary ways.'" <u>Lovelace</u>, 472 F.3d at 182 (*citing* 146 Cong. Rec. S7775 (July 27, 2000) (joint statement of Sen. Hatch and Sen. Kennedy). Thus, the RLUIPA guarantees incarcerated people greater freedom to engage in religious conduct than does the First Amendment. According to RLUIPA, a government is prevented from imposing a "substantial burden on the religious exercise of a person residing in or confined to an institution," unless the government demonstrates that the imposition of the burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. §2000cc-1; <u>see</u> <u>also</u> <u>Cutter v. Wilkinson</u>, 544 U.S. 709. 717 (2005) (upholding RLUIPA's constitutionality). In sum, RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore

dependent on the government's permission and accommodation for exercise of their religion." Cutter, 544 U.S. at 718.

When analyzing a claim under RLUIPA, the court must determine whether the government program or activity at issue receives federal financial assistance. See 42 U.S.C. §2000cc-1(b)(1).[28] When analyzing the substance of the claim, the burden of persuasion is on the plaintiff to demonstrate that the "government practice that is challenged by the claim substantially burdens the plaintiff's exercise of religion." 42 U.S.C. § 2000cc-2(b). Under RLUIPA, "religious exercise" is broadly defined as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. §2000cc-5(7)(A). Once the court determines whether the plaintiff's claim involves a "religious exercise," then the court must assess whether the burden was "substantial." 42 U.S.C. §2000cc-2(b). The Fourth Circuit followed the Supreme Court's guidance in First Amendment Free Exercise Clause cases and found that "for RLUIPA purposes, a substantial burden on religious exercise occurs when a state or local government, through act or omission, 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" Lovelace, 472 F.3d at 187 (citing Thomas v. Review Bd. of Ind. Employment Sec. Div., 450 U.S. 707, 718, 101 S.Ct. 1425 (1981)).

Once the plaintiff demonstrates that a government practice substantially burdens their exercise of religion, the burden shifts to the defendant to show that the government practice or policy is "the least restrictive means of furthering a compelling government interest." See Id. at 189. When applying the "compelling government interest" standard, the court must consider the "context" of the claim and apply the standard with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to

---

[28] RLUIPA also applies in a case when "the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes." 42 U.S.C. §2000cc-1(b)(2).

maintain good order, security and discipline, consistent with consideration of costs and limited resources." Id. at 189-90 (*citing* Cutter v. Wilkinson, 544 U.S. 709, 723, 125 S.Ct. 2113 (2005)). The court is to pay particular consideration to security concerns. Id. Moreover, RLUIPA is not meant to "elevate accommodation of religious observances over an institution's need to maintain order and safety." Id.

**1) WVDOC Grooming Policy Claim**

Article III of the United States Constitution, limits the jurisdiction of the federal courts to cases or controversies. Therefore, a case becomes moot when there is no viable legal issue left to resolve. See Powell v. McCormick, 395 U.S. 486, 496 (1969). If developments occur during the course of a case which render the Court unable to grant a party the relief requested, the case must be dismissed as moot. Blanciak v. Allegheny Ludlum Co., 77 F.3d 690, 698-699 (3rd Cir. 1996).

Here, plaintiff seeks equitable relief in the form of a directive requiring the HCC to respect his religious rights by permitting him to grow a beard of at least ¼ inch in length, and to re-write its policy regarding making Muslim inmates shave. The defendants' Supplemental Response indicates that effective March 1, 2015, pursuant to the Supreme Court's holding in Holt v. Hobbs, the WVDOC changed its inmate grooming policy, Policy Directive 334.01, to be consistent with the dictates of Holt v. Hobbs and RLUIPA. Plaintiff is now permitted to grow facial hair up to ½" long unless he has been specifically identified the HCC's Chief of Security as a substantial risk to cause violence or to escape. They aver that Plaintiff has not been so identified.

Accordingly, because there is no relief that this court can offer as to this particular claim, it must be dismissed as moot. Because this claim is moot, it necessarily follows that the claims

against defendants Rubenstein, Plumley, Miller, Stevens and Shreve regarding it are moot as well.

Despite the fact that plaintiff's complaint only states a specific claim for injunctive relief as to the shaving issue, the undersigned notes that plaintiff's complaint has stated other claims as well. Given the liberal standards set forth for *pro se* filers to develop meritorious claims, the Court will address those claims next.

### 3) Fourteenth Amendment Equal Protection Claim Regarding WVDOC's Religious Services Policy

Plaintiff's Complaint also states an Equal Protection claim. Specifically, plaintiff contends that it was on defendant Plumley's authority that defendant Stevens required Muslim inmates to watch videos of the MOCC's Imam, instead of permitting them to conduct their own services the way inmates of other faiths did, and defendants Miller and Stevens treated HCC Muslim inmates differently than Christian inmates, failing to accord Muslim inmates with the same rights as inmates of other faiths receive.

The Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, §1. The Clause "is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., Inc ., 472 U.S. 432, 440 (1985).

> To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination. Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny.

Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001). Moreover, in the prison setting, the Equal Protection Clause entitles each prisoner to "a reasonable opportunity of pursuing his faith

comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts." Cruz v. Beto, 405 U.S. 319, 322 (1972).

Under the four-part balancing test required by Turner, the plaintiff can succeed only "if the difference between the defendants' treatment of him and their treatment of . . . inmates [of other faiths] is 'reasonably related to legitimate penological interests.'" Shakur v. Schriro, 514 F.3d 878, 891 (9th Cir. Ariz. 2008) (quoting DeHart v. Horn, 227 F.3d 47, 61 (3rd Cir. 2000) and Clark v. Groose, 36 F.3d 770, 773 (8th Cir. 1994).

**Defendants Miller and Stevens**

Plaintiff alleges that defendant Stevens, as HCC's chaplain, permitted Christian inmates to conduct their services with "and most often without" a chaplain, but she required the Muslim inmates services to be physically monitored, usually by her, to ensure that no Muslim inmate attempted to take a leadership role in the service.[29] Further, she consistently and "routinely" permitted inmates attending Christian services, such as Kairos,[30] Jehovah's Witness,' and others to carry out prayers, and/or give sermons, opinions, and testimonials or personal opinions on issues related to their faith, while Muslim inmates were restricted from doing so during their services.

On its face, the defendants' response to these allegations initially appears ambiguous. While they admit that "[d]efendant Stevens or other staff at the . . .[HCC] may monitor religious services of Muslim inmates and enforce Policy and Procedure[,"][31] they do not specifically say

---

[29] Dkt.# 1-1 at 10.

[30] Kairos was born in 1975 out of Cursillo, a Catholic movement that encouraged Christians to live out their faith in community, by Tom Johnson, a Miami, Florida attorney. The organization is now known as Kairos Prison Ministry International (KPMI), and exists in 34 states and 9 countries, providing services at 420+ ministry sites; about 650 weekend prison events are held each year. See < http://www.mykairos.org/docs/kpmi/npe.pdf >

[31] Dkt.# 24 at 4.

that only HCC's Muslim services were monitored, or even that the Muslim inmates' services were always monitored. Their contention that WVDOC "policy has provided that inmates will not conduct or lead a service or facilitate religious programs"[32] seems to imply that no inmate of *any* faith can conduct their own services, in contradiction of plaintiff's claims. However, the issues are clarified in a November 18, 2013 memo from defendant Stevens to plaintiff, attached to plaintiff's complaint. The memo was apparently written in response to plaintiff's Grievance No. 13-HCC-B1-354, regarding his claim that he and other Muslim inmates were being treated differently "just because they are few in numbers or hold non-traditional beliefs."[33] In it, Stevens references WVDOC Policy Directive 510.00, stating in pertinent part:

> [i]f a substantial burden exists is there a compelling government interest that is furthered by the restriction? Yes. The institution is compelled to follow the Policy Directives set forth by the . . . [DOC]. Policy Directive 510.00 states "at no time will an inmate conduct the service, lead religious services, or facilitate religious programs." Leadership implies/assumes authority and ownership neither of which can be granted to inmates. Allowing inmates to have a position of leadership in any capacity can disrupt the orderly operation of the facility, posing a potential threat to inmates and staff and the public . . . also . . . an inmate may have an incentive to inflame or exert influence over other inmates and may advocate radical or inflammatory position [sic] in an attempt to recruit members . . . additional danger is that inmate-led religious activity may be merely a cover for gang or other unlawful activity . . . Additionally your views may not be the correct views of the Quran or the view of others . . . caus[ing] other inmates to become upset at you and may cause you a safety issue. All of these issues become a concern for the safety and security of the inmates, public staff. The main goal of the facility is to provide and maintain order and safety. Is there a less restrictive alternative? Yes. The institution does get DVD's [sic] from MOCC where the imam performs the Khuthab [sic][34] and gives the Salat[35] that is viewable during any of the corporate worship.

---

[32] Dkt.# 24, ¶19 at 4.

[33] Dkt.# 1-3 at 7.

[34] The Khutbah is a sermon preached by an imam in a mosque at the time of the Friday noon prayer. <u>See</u> < http://dictionary.reference.com/browse/khutbah >

[35] Salat is the Islamic ritual prayer performed five times daily: at dawn, midday, afternoon, sunset, and evening. It is one of the five pillars of Islam. Prayer is always directed in the direction of the Ka'ba shrine in Mecca. A prayer mat is commonly used during salat. Salat may be performed alone but carries special merit when done with other

Dkt.# 1-3 at 7 – 8.

Next, plaintiff alleges that because HCC could not get an Imam to lead Muslim inmates' worship services, the HCC Muslim inmates "persistently asked to be able to carry out prayers and religious discussions on their own."[36] However, instead of permitting this, Stevens required that the Muslim inmates watch a video of MOCC's Imam conducting a service.

The defendants' contend that "an Imam has not been available to lead religious matters" at HCC and therefore, "alternative methods, including video from the . . . [MOCC] have been used." Defendant Stevens' November 18, 2013 memo from defendant Stevens sheds further light on this point; it states that "chaplains have asked multiple times for Islamic speakers to come into the facility to address the Muslim community with no success. Also, on numerous occasions the chaplains have sought donations for Islamic inmates, and just recently received a shipment of Qurans and other books."[37]

Accordingly, it is apparent that there is a (1) "valid, rational connection" between the prison regulation and that HCC's interest was not "so remote as to render the policy arbitrary or irrational;" (2) that there was an "alternative means of exercising the right . . . open to prison inmates," and HCC Muslim inmates were not deprived of all forms of religious exercise and were able to participate in other observances of their faith; (3) an accommodation, the ability to be able conduct their Islamic services via the MOCC Imam on video, would maintain security, order and safety for staff and inmates without unduly taxing prison resources; and (4) the video provided an "obvious, easy alternative" to the challenged regulation or action. Lovelace, 472

---

Muslims. The focal prayer of the week is the Friday midday prayer at the mosque. See < http://www.religionfacts.com/salat >

[36] Dkt.# 1-1, ¶21 at 4 – 5.

[37] Dkt.# 1-3 at 7.

F.3d at 200 (*citing* <u>Turner</u>, 482 U.S. at 89–92 (internal quotation marks and citations omitted)). Moreover, it is apparent from WVDOC Policy Directive 510.00 that HCC's policy regarding Muslim inmates' ability to conduct their own religious services is a WVDOC – wide policy, not merely one confined to HCC, nor does it single out only Muslim inmates.

Finally, as for plaintiff's allegation that defendant Miller was responsible for managing the prison's religious services and assisted Stevens in drafting religious policy that treated Muslims differently than Christians by requiring them to watch the Imam video instead of permitting them to conduct their own services, it is apparent that Miller's actions, like those of Stevens, were governed by WVDOC policy, and that Miller was neither drafting her own policies nor managing Muslim inmates' services any differently than the services of inmates of other faiths. Therefore, this claim, like plaintiff's claims against defendant Stevens, fails to state a claim upon which relief can be granted.

**<u>Defendant Plumley</u>**

Plaintiff alleges that defendant Plumley, as HCC's Warden, was the "ultimate policy maker" for HCC,[38] and it was on his authority that defendant Stevens made HCC Muslim inmates watch videos of MOCC's Imam instead of permitting them to conduct their own services.

To the extent that plaintiff is suing defendant Plumley in his individual capacity, he has failed to state a claim. In order to establish personal liability against a defendant in a §1983 action, the defendant must be personally involved in the alleged wrong(s); liability cannot be predicated solely under *respondeat superior*. <u>See</u> <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978); <u>Vinnedge v. Gibbs</u>, 550 F.2d 926, 928 (4th Cir. 1977).

---

[38] Dkt.# 1 at 2.

The plaintiff does not allege any personal involvement by defendant Plumley in the denial of his religious rights. Instead, his only allegation regarding defendant Plumley is that as Warden, Plumley functioned as HCC's "ultimate policy maker" on whose authority defendant Stevens made HCC Muslim inmates watch videos of MOCC's Imam conducting services, instead of permitting them to conduct services themselves.

When a supervisor is not personally involved in the alleged wrongdoing, he may be liable under §1983 if the subordinate acted pursuant to an official policy or custom for which he is responsible, see Fisher v. Washington Metropolitan Area Transit Authority, 690 Fed 2nd 1113 (4th Cir. 1982); Orum v. Haynes, 68 F.Supp.2d 726 (N.D. W.Va. 1999), or the following elements are met: "(1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a 'pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offense or practices,' and (3) there was an affirmative causal link between the supervisors inaction and the particular constitutional injuries suffered by the plaintiff." Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994), cert. denied, 513 U.S. 813 (1994).

"Establishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm or constitutional injury." Id. "A plaintiff may establish deliberate indifference by demonstrating a supervisor's continued inaction in the face of documented widespread abuses.'" Id.

As noted *supra,* like with plaintiff's claims against defendants Miller and Stevens, it is apparent that defendant Plumley was governed by the WVDOC's policies, and thus he could not

have been HCC's "ultimate policy maker" as to Muslim inmates' religious services. Likewise, because there was no Imam available locally, it was reasonable for HCC to provide the video of MOCC's Imam to the Muslim inmates at HCC, rather than have them be deprived of any service at all.

To the extent that the plaintiff may be asserting that defendant Plumley were deliberately indifferent to his Equal Protection rights by denying administrative grievances he filed over issue, any such claim is without merit, because that is not the type of personal involvement required to state a claim. See Paige v. Kuprec, 2003 W.L. 23274357 *1 (D. Md. March 31, 2003).

A careful review of the plaintiff's complaint establishes that plaintiff has failed to assert credible allegations to support a finding that the elements necessary to establish supervisory liability against Plumley are present. Accordingly, then, any claim he might have of deliberate indifference to his Equal Protection rights against Plumley fails to state a claim upon which relief can be granted.

Accordingly, despite the deficiencies in the record and plaintiff's continued failure to respond to the defendants' supplemental response/motion for summary judgment, despite being given two opportunities to do so, the undersigned finds that plaintiff's remaining claims fail to state a claim upon which relief can be granted.

## V. **Recommendation**

For the reasons stated above, the undersigned hereby recommends that the defendants' Motion for Summary Judgment (Dkt.# 28) be **GRANTED** and plaintiff's Complaint should be **DENIED** as to all defendants and **DISMISSED with prejudice as moot and for failing to state a claim upon which relief can be granted**.

Within **fourteen (14) days** after being served with a copy of this Report and Recommendation, **or by February 3, 2016**, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such objections. A copy of any objections shall also be submitted to the United States District Judge. **Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation**. 28 U.S.C. §636(b)(1); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk is directed to send a copy of this Report and Recommendation to the *pro se* plaintiff by certified mail, return receipt requested, to his last known address as shown on the docket, and to counsel of record via electronic means.

DATED: January 20, 2016

/s/  James E. Seibert_____
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE